# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5814 | **DATE** | 3/4/2002 |
| **CASE TITLE** | Kelman vs. Woolrich, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment as to Counts I and II is denied. Defendant's motion for summary judgment as to Count III is denied with respect to Baer and Pasternak but granted as to defendant Oliver [19-1]. Status hearing is set for 3/18/02 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | |
|---|---|---|---|---|---|---|
| | No notices required. | | 2 number of notices | | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | MAR 0 5 2002 date docketed | | | 35 |
| | Notified counsel by telephone. | | | | | |
| | Docketing to mail notices. | | docketing deputy initials | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | | | |
| | Copy to judge/magistrate judge. | | 3/4/2002 date mailed notice | | | |
| MD | courtroom deputy's initials | 02 MAR -4 PM 4:20 Date/time received in central Clerk's Office | MD mailing deputy initials | | | |

**DOCKETED**

MAR 0 5 2002

| | | |
|---|---|---|
| CLIFFORD KELMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 C 5814 |
| | ) | |
| WOOLRICH, INC., ANGEL OLIVER, | ) | |
| KERRIE PASTERNAK and | ) | |
| COLLEEN BAER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Presently before the court is the motion of defendants for summary judgment on plaintiff's claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count I), age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (Count II), and tortious interference with employment relationship (Count III). For the reasons set forth below, the court grants the motion in part and denies it in part.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

Defendant, Woolrich, Inc. ("Woolrich"), is a manufacturer and retailer of outdoor clothing and accessories and operates a number of stores throughout the United States, including a store in the Woodfield Mall in Schaumburg, Illinois. Plaintiff Clifford Kelman ("Kelman"), a white male, began working at the Woodfield Mall store in November 1993 as a part-time keyholder[1] when he was 52 years old. Kelman was hired by defendant Kerrie Pasternak ("Pasternak"), manager of the Woodfield Mall store, who reported to Woolrich's Vice President of Retail, defendant Angel Oliver ("Oliver"). A few months after hiring Kelman, Pasternak recommended that he be promoted to assistant manager, and Oliver (who is a male and nearly 11 years older than Kelman) promoted him. On or about November 25, 1998 when Pasternak went on maternity leave, Kelman became the store's acting manager. At the time Kelman became acting manager, the store's two keyholders were

---

[1] A "keyholder" is given the keys to the store and is authorized to open and close the store on behalf of the manager and assistant manager of the store. Keyholders also act as supervisors over a store's staff.

Bill Waldack ("Waldack") and defendant Colleen Baer ("Baer"). Kelman was terminated on December 17, 1998, when he was 58 years old.

<u>Woolrich's Version of Kelman's Termination</u>

According to Woolrich, during the week of December 7, 1998, Waldack complained to Woolrich's Merchandise Manager, Mike McCarter ("McCarter"), that Kelman was "abusive," threw temper tantrums and communicated to the staff primarily through written notes instead of speaking directly to them. Waldack forwarded McCarter several notes Kelman had written to Waldack and the store's staff and told McCarter the whole staff wanted to quit. McCarter relayed Waldack's complaints to Oliver and Charles Bittner ("Bittner"), Woolrich's Manager of Human Resources, and Bittner reviewed the notes. One of them, addressed to the staff and dated December 8, 1998, stated that "the store looked like crap!" and in regard to the staff's performance, stated "I was not born yesterday and very little ever get's [*sic*] by me so why waste your time. . . . The choice is yours, but I would rather do it the easy rather than the hard way which is to continue to harp and ride you." Another note, apparently written the next day, by Kelman to Waldack, stated "the store looked like crap" and in regard to how late the staff left the store: "There [*sic*] job is to work and I am sick and tired of their B.S. . . . I think we have to start shaping up or some of them after Christmas may be shipped out." That week, McCarter and Oliver called Kelman and discussed Waldack's complaints. They told Kelman he was expected to treat everyone with dignity and respect. They also told Kelman that mistreating the staff was completely unacceptable and would not be tolerated.

On December 15, 1998, Baer decided to quit and called Pasternak, who was at home on maternity leave, to inform her of her decision and, as a courtesy, to Pasternak to explain to Pasternak why she was quitting. Baer also informed Waldack of her decision and gave him her keys but did

3

not inform Kelman because she was upset with him. Later that day, Pasternak called Bittner and told him that the store's two keyholders, Baer and Waldack had quit.[2] She told Bittner that Waldack had quit because of Kelman's abusive manner and that Baer had quit because she felt sexually harassed by, and uncomfortable around, Kelman. Pasternak faxed Oliver a letter that evening detailing Baer's complaints and also mentioned an incident that had occurred in which Kelman allegedly harassed a teenage employee, Jessica Schultz ("Schultz"). The letter states:

> I received a phone call from Colleen, one of our key-holders today. She called to explain why she could no longer work for Woolrich due to the following incidents.
>
> Last Wednesday night when she arrived home there was a message on her answering machine from Cliff [Kelman]. As she returned his phone call to his home, his roommate Larry gave him the phone and stated she had a sexy voice. Cliff then said 'he thinks you have a sexy voice.' She was very upset that Cliff did not seem to think that the comment was out of line. The next day Cliff said that Larry wanted to know if she was working? Cliff said that he told him that she had the day off and was at home, but that Larry called her at the store. A few days later when she was talking with some of the part-time employees they said that her husband called the other day. She asked what he had said, and they said she was on her way home. He said to the person on the phone, 'good so I can lay her down on a bed of roses.' She realized that it was not her husband who had called but this Larry person. She then explained to the employee that her husband would never say anything like that to anyone. The next day [on or about December 14, 1998] Gloria, Cliff, and Colleen were all on the selling floor and Gloria said to Cliff 'Aren't you glad we have Colleen' and Cliff's comment back was 'yes, but I'd prefer her ten years younger and a little taller.' That comment was all she could take. Colleen Gave [sic] her keys to Bill to give to Cliff. When Bill told Cliff that she was not returning Cliff stated that she was on a Monica Luwinski [sic] trip!
>
> I had a conversation with Cliff a few weeks before I went on maternity leave about sexual harassment. One of the part-time teenage girls [Schultz] had a friend stop in. After she left Cliff made the comment 'what do you think of her for me, Maybe if she was a few years older.' I explained that you cannot even make comments like that in a joking manner. In the 90's any type of comment like that could be considered sexual harassment. He said that he understood and did not mean any harm. He apologized to the employee and said he would be more careful.

---

[2] Defendants do not state how Pasternak was made aware that Waldack had quit and have not submitted an affidavit from Waldack.

Even though I am on maternity leave, I called you to express my concern about this situation. I do not even think that Cliff realizes that his actions cause harm to others. But he does not seem to have any respect for Colleen or feel that his comments or his roommates [*sic*] are inappropriate. I can understand why Colleen feels so uncomfortable and can no longer work with him. I hope that you will give Colleen a call to discuss this with her.

(Defs.' 56.1 Statement, Bittner Aff., Ex. B.)[3] On December 16, 1998, Oliver, McCarter and Bittner called Baer and discussed her reasons for quitting.

Bittner considered the situation at the store to be a crisis. Before Waldack and Baer quit, there were essentially three supervisors at the store: Kelman, Waldack and Baer. After they quit, Kelman was the only supervisor. It was also ten days before Christmas, which is a critical time for a retail clothing store. The store was open from 9:00 a.m. to 11:00 p.m. every day. Based on Waldack's complaints about Kelman, it appeared to Bittner that other employees might also quit due to Kelman's abrasive management style. Given these circumstances, Bittner did not believe that the store would be able to function with Kelman acting as the store's manager. Also, in Bittner's view, Kelman's conduct was unacceptable because he directly harassed Baer and Schultz and acted indifferently when informed that his roommate's comments were offensive. Woolrich has a written

---

[3]Baer submitted an affidavit in which she confirms what Pasternak wrote in the letter and adds that Kelman admitted calls had been made to the store by his roommate but acted as if they were funny and was indifferent to the fact that the calls upset Baer. Baer also states she informed Pasternak of a comment Kelman made to Schultz in October, 1998, in which Kelman had asked Schultz whether a customer, who appeared to be about 16, was "too young for [him]?" and said that "a man his age wanted to be with younger women." Baer states Schultz had approached her about the comment. A few days later, Kelman told Baer that Pasternak had talked to him about the Schultz incident and admitted to Baer it was a form of sexual harassment, but said, "you know, boys will be boys." Baer also mentioned an incident, not set forth in Pasternak's letter, in which Kelman made a comment to Baer in October, 1998 about an attractive young girl that had come into the store, referring to her age and that she would be "right" for him. Baer said that his comment was "disgusting" and walked away. (Def.'s 56.1 Statement, Ex. C.)

Schultz submitted an affidavit, in which she states that in October, 1998, after an attractive young (about 16) girl had come into the store, Kelman approached Schultz and asked her whether she thought he had a chance with a girl like her. Schultz told him that the girl looked like she was Schultz's age, but Kelman said "a man in his old age wants the younger ones." Schultz said that Kelman proceeded to talk about how much more attractive younger girls are than older ones, which made Schultz, who was 16 at the time, feel uncomfortable. Schultz does not state in her affidavit that she spoke to anyone about these comments. (Def.'s 56.1 Statement, Ex. D.)

sexual harassment policy which provides that it is the company's policy to "maintain a working environment free of all forms of sexual harassment or intimidation."[4] As the store's acting manager, it was Kelman's duty to administer the policy and to take appropriate action to keep the store free from sexual harassment and intimidation.

On Thursday, December 17, 1998, Oliver and Bittner flew to Chicago and met with Kelman at the Woodfield Mall store. At that meeting, they discussed Baer's and Waldack's complaints and told Kelman that they were going to terminate his employment and he would have the option of resigning if he so desired. The decision to terminate Kelman was made jointly by Oliver and Bittner. They decided to terminate Kelman because of the allegations of sexual harassment and the complaints about his "abusive" management style. Oliver and Bittner met with Waldack and Baer and asked them to come back to work. They asked Baer to come back as the assistant manager (at the time the position was also for acting store manager because Pasternak was on leave) upon the recommendation of Pasternak and because she appeared to be more qualified than Waldack, and Baer came back. In February, 1999, Pasternak returned from maternity leave and, after several

---

[4]Woolrich's Sexual Harassment policy states, in full:

> It is the policy of Woolrich, Inc. to maintain a working environment free of all forms of sexual harassment or intimidation. Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature are serious violations of our policy and will not be condoned or permitted. Any co-worker subject to sexual harassment or intimidation should immediately contact their store manager, division manager or other appropriate Company official, who will in turn notify [Human Resources.] A prompt investigation of such complaint will be conducted in a confidential manner. Any co-worker who violates this policy will be subject to, but not limited to, appropriate disciplinary action, up to and including discharge.

(Pl.'s Ex. 4, Woolrich Employee Handbook, at 18-19.)

weeks, resigned. Baer was promoted to manager and remained in that position until she resigned in October 1999.

Kelman's Version of His Termination

Kelman claims that he was terminated because of his sex and age. According to Kelman, Pasternak was on a reduced schedule from the time she announced her pregnancy in March or April, 1998 until she gave birth in late November 1998 when she went on full-time maternity leave. Kelman ran the store when Pasternak was not there, and Oliver and McCarter told Kelman that he would take over the store while Pasternak was on maternity leave. At some point, Pasternak expressed to Kelman that she did not believe she would be returning to work after her maternity leave.

Kelman claims Pasternak's treatment of him changed when she decided to go on maternity leave (prior to that Pasternak treated him well) as he would be assuming responsibility for store management upon her leaving. Specifically, in the summer of 1998, Pasternak told Kelman that he would be the last male hired to work under her and she would make sure a woman takes over the store. Pasternak made this comment on several other occasions as well. In September 1998, she questioned Kelman about why he would want to assume the manager's position when she went on maternity leave and why he would want to stay with Woolrich because he did not need the anxiety and was "too old" and suggested he look for another job. Pasternak also told Kelman that she had informed Oliver on September 17, 1998, that she was uncomfortable turning the store over to Kelman because he was "too old" and that at his age, she did not think he would have the ability to run the store.

Kelman told Pasternak, in mid-September 1998, that she was making his impending transition to acting store manager difficult because she was not showing him certain things about running the store, but was showing Baer (who had just started as a part-time keyholder that month) many procedures, which, Kelman opines, a keyholder did not need to know and should not have been shown. Kelman claims it was the assistant manager's job to train keyholders, yet Pasternak personally trained Baer. And, in response to Kelman's suggestion that Pasternak should be showing the procedures to Waldack because he was a full-time keyholder, Pasternak said Waldack is "too stupid because he's a man." Kelman states that Pasternak made several other derogatory comments about men during his tenure there, such as "You men are all the same. All you want to do is undress [women] and screw them."

Kelman had problems with Waldack not doing his job in the weeks prior to his termination, but states that these problems had begun before he took over as acting manager and that he had asked Pasternak for her assistance (both before and after she went on maternity leave) but she refused and attributed Waldack's poor behavior to the fact that, "He's stupid. He's a man." With respect to leaving notes, Kelman states that Pasternak trained him to leave notes for the staff when he was dissatisfied with subordinates' job performance and that she left notes herself. Kelman objects to Waldack's characterization of his management style as "abusive" and denies that Oliver and McCarter admonished him about mistreating staff or said that his behavior was unacceptable and would not be tolerated. Kelman claims that they merely relayed to him the nature of Waldack's complaints, and that Oliver told him that if he communicated verbally, there would be "no problems" and he would "do [his job as manager] well." Kelman said he did as he was told and stopped leaving notes, but that Waldack's behavior did not improve.

8

Kelman agrees that he had the responsibility to enforce the company's policy on sexual harassment, but denies that any sexual harassment as defined under either Woolrich's policy, or the law, took place. With respect to Schultz, he states that sometime in October, 1998, Schultz and two other employees (Melissa Mueller ("Mueller") and a male employee) initiated a conversation with him after they noticed him spending a long time with a customer whom they thought he was interested in asking out, and he told them that he thought she was attractive and had thought about asking her out but that he doesn't date. To his knowledge, Schultz never complained about any comments. Nevertheless, shortly thereafter, Pasternak had a conversation with him in which she accused him of sexually harassing Schultz and Mueller. He denied that anything he said was sexual harassment, but Pasternak said, "It doesn't matter" since "[a male] can't say anything to a female." Because Pasternak had told him he sexually harassed Schultz and Mueller, he approached them to offer an apology, but they responded no apology was necessary since he did not sexually harass them and said that Pasternak must have overheard them talking and made her own assumptions. Kelman denies ever discussing the Schultz-Mueller matter with Baer.

With respect to Baer's allegations, Kelman denies making any of the comments attributed to him by Baer, claims he was not aware (prior to his termination) of instances of a man calling the store and claiming to be Baer's husband and making the remarks attributed to that person, and that Baer never complained to Kelman about his roommate. He claims that Baer falsely accused him of sexual harassment.

Kelman learned of Baer's intent to resign through a conversation with Waldack, on or around December 15, 1998, in which Waldack said that Baer resigned because she could not take the strain of how the store was run and the difference of opinion between Kelman and Waldack and did not

9

mention sexual harassment. Kelman told Waldack that it was Baer who had been talking about Waldack behind his back but that she had tried to make it appear as though Kelman had been making negative comments about Waldack. Kelman reassured Waldack that he (Kelman) was not a hard person to please and that all Waldack had to do was make an attempt to do his job. Kelman says that shortly after this conversation, Waldack called him and agreed to come back to work. Kelman claims that he also attempted to call Baer to ask her to come back to work but that she did not return his calls.

With respect to his termination, Kelman points to a December 16, 1998 memorandum, which states, in part, "it has been decided to terminate your [Kelman's] employment," as evidence that the decision to terminate him had already been made prior to the December 17, 1998 meeting with Kelman. Kelman claims that the decision to discharge him was made by Oliver and that Bittner was present at the December 17 meeting only in the capacity as a witness. According to Kelman, in that meeting, Oliver informed him that he was being discharged because Baer had accused him of sexual harassment. Kelman testified to the conversation as follows:

Q. So when Mr. Oliver said to you that you had been accused of sexual harassment, how did you respond?

A. Blank look on my face and my mouth dropped open with no words coming out.

Q. Who spoke next?

A. He repeated it because I was speechless and I said I don't understand. Clarify.

Q. Did he clarify?

A. He said Colleen [Baer] has accused you of sexual harassment and I says that's untrue. She's not correct. As a matter of fact, she's a liar. He said, well, doesn't matter. You're a man, she's a woman. She's right, you're wrong. I says I don't think you understand today's terminology insofar as hiring and firing. I says that's

10

not the way it works. I says I have a right to defend myself. I'll take a lie detector test. Immaterial. I says where's the investigation? Doesn't have to be. I says I need to defend myself. He says you can't. She's going to sue the company and you and we can't afford it and neither can you. I says, yes, I can afford it and so can you. I says you're making a mistake. He says, no, we can't afford it. We have to let you go. She said that you have to go or she's going to sue us. He says I know there was a phone call made by some other person. It wasn't done by you. I said so go after the other person. He says you're the easy access. I says but I'm not guilty.

(Pl.'s 56.1 Statement of Additional Facts, Kelman Dep., 7/24/2000, 8-9.)

Kelman denies that Oliver and Bittner asked Waldack to come back to work because Waldack had agreed in a phone conversation with Kelman to return to work. Kelman also denies that Baer was given his position because she was better qualified, but asserts that she was given it at the recommendation of Pasternak and because she (Baer) threatened to sue. Kelman filed his charge with the EEOC in May, 1999 and filed the instant federal complaint in September, 1999, claiming he was fired because of his sex and age in violation of federal law and that the defendants tortuously interfered with his employment in violation of state law. Defendants contend that they are entitled to summary judgment on plaintiff's claims.

## DISCUSSION

### I.      Counts I & II – Sex and Age Discrimination

To prevail on his discrimination claims, plaintiff must show he was intentionally discriminated against because of his sex or age. *See* 42 U.S.C. § 2000e-2 (sex); *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998); 29 U.S.C. § 623(a)(1) (age); *Denisi* v. *Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). He may demonstrate discriminatory intent by the direct method (which involves direct or circumstantial evidence that the decision to terminate him was motivated by his gender), or by using the "indirect" burden-shifting approach of

*McDonnell-Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). *Ransom* v. *CSC Consulting, Inc.*, 217 F.3d 467, 468 (7th Cir. 2000). In response to defendants' motion for summary judgment, plaintiff argues that he has presented sufficient evidence to survive summary judgment under both methods.

## A.    Direct Method

"Direct evidence is that which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Kennedy* v. *Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (internal citations and quotations omitted). Direct evidence has been described as an acknowledgment by a decisionmaker that the adverse employment action was taken because of some immutable characteristic. *See id.* Most employment discrimination cases, however, do not involve direct evidence in the form of an admission by the employer that the employee was terminated because of his sex. Nevertheless, under the direct method of proof, remarks that are based on a sex stereotype, can show that sex played a part where there is also evidence the employer actually relied on such stereotype in making its decision. *See Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 251 (1989) ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.") (internal citations and quotations omitted). Such proof usually consists of statements by the decisionmaker that are contemporaneous with the adverse employment action or causally related to the decision-making process. *Id.* at 277 (O'Connor, J., concurring); *Geier* v. *Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996).

According to plaintiff, Oliver made the decision to terminate him due to allegations of sexual harassment, specifically by Baer, but that when plaintiff denied the allegations, Oliver told him "it

doesn't matter. You're a man, she's a woman. She's right, you're wrong." Likewise, Oliver told him no investigation would be undertaken in which plaintiff could defend himself because Baer had threatened to sue Woolrich if plaintiff was not fired and Woolrich could not afford it. Plaintiff argues that these comments reflect a "double standard" based on sex. Defendants, while not expressly admitting that Oliver made these statements, also do not deny they were made. Defendants argue, however, that these comments do not directly prove that Oliver decided to terminate plaintiff because of his sex, but at most, "are evidence that Oliver terminated Kelman out of fear that Woolrich would be sued if Kelman was not terminated." (Defs.' Reply, at 4.)

The court concludes that a jury could infer that the comment "You're a man, she's a woman. She's right, you're wrong" reflects a stereotype that when men are accused of sexual harassment, the charges more likely than not (if not always) are true. Further, a jury could infer from the fact that Oliver made the comment in the same conversation in which he informed plaintiff he was terminating him because of accusations of sexual harassment by a woman (who said she was going to sue Woolrich unless plaintiff was fired), that the decision was based on a discriminatory motive. That Oliver himself is a man does not diminish the nature of the discrimination.[5]

Plaintiff has also put forth evidence of discriminatory intent by "a mosaic of evidence which, taken together, would permit a jury to infer discriminatory intent[.]" *See Kennedy*, 140 F.3d at 725 (quoting *Piraino* v. *Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996)); *Harris* v. *Univ. of Illinois at Chicago*, No. 97 C 4783, 1999 WL 281346, at *8 (N.D. Ill. Mar. 31, 1999)

---

[5]*Mellinger* v. *Combined Ins. Co. of America*, No. 99 C 4530, 2001 WL 185183, at *8 (N.D. Ill. Feb. 26, 2001), relied upon by defendants is inapposite. Although the *Mellinger* court held that an employee who exposes his employer to the risk of a sexual harassment lawsuit may legitimately be terminated because of that risk, there were no discriminatory remarks by the decisionmaker as is asserted in the instant case.

(Kocoras, J.). There is evidence that Pasternak, plaintiff's superior, harbored discriminatory animus toward plaintiff's sex and age. With respect to his age, plaintiff's evidence is that Pasternak made comments, shortly before her maternity leave, that she was uncomfortable turning the store over to him because he was "too old," that at his age, he did not have the ability to run the store, and suggested he look for a job elsewhere. With respect to his sex, in addition to various derogatory comments about males, plaintiff states that Pasternak told him in the summer of 1998, that he would be the last male hired to work under her and she would make sure a woman takes over the store. There is also evidence to support the inference that she worked toward that goal if plaintiff is believed that Pasternak showed Baer particular managerial skills that she did not show him (or even Waldack, the other male supervisor, who had been there longer than Baer). Moreover, Pasternak's comment to plaintiff regarding Schultz in October, 1998 that "It doesn't matter" since "[a male] can't say anything to a female" is one from which a jury could infer she held a stereotype about men that influenced her view both of the Schultz incident and Baer's allegations.

Although plaintiff does not contend that Pasternak was the person who fired him, he rightly points out that the discriminatory animus of a non-decisionmaker may be attributed to the employer, where there is evidence that the decisionmaker(s) acts as the conduit for the prejudice of another person whose influence in the adverse action is decisive. *Shager* v. *Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (describing this as "cat's paw" evidence); *see also Dey* v. *Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994). The evidence shows that it was Pasternak who called Bittner to tell him that Baer and Waldack had quit and faxed a letter to Oliver, which, *inter alia*, expressed her disapproval of plaintiff. Specifically, Pasternak wrote "to express [her] concern about this situation," that she did not think plaintiff realized "his actions cause harm to others," that "[Kelman] does not

seem to have any respect for Colleen or feel that his comments or his roommates [*sic*] are inappropriate" and stated, "I can understand why Colleen feels so uncomfortable and can no longer work with him."[6]

The court disagrees with defendants that their investigation – interviewing Baer – breaks the causal connection. Although Oliver and Bittner had spoken with Baer about her allegations, Bittner's own affidavit suggests he relied on Pasternak's letter to support his reasons for terminating plaintiff and there is no evidence that Oliver and Bittner spoke with Schultz or Waldack between December 16 and 17 (prior to plaintiff's termination), which raises the inference they accepted at face value Pasternak's statements. In any event, with respect to Baer, as set forth, *supra*, the evidence suggests that Oliver's accession to her threat was motivated by adherence to a stereotype about males. Plaintiff has, therefore, put forth sufficient evidence to go to the jury under the direct method of proof.

## B. Indirect Method

The court also concludes that plaintiff has put forth sufficient evidence under the less rigorous *McDonnell-Douglas* approach. Under this approach, in order to establish a *prima facie* case for gender discrimination, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate business expectations; (3) he suffered an adverse employment action; and (4) that, in the case of sex discrimination, he was replaced by a female, or in the case of age discrimination, someone substantially younger. *E.g., Drago* v. *Aetna Plywood,*

---

[6]Although defendants contend that there is no evidence that Pasternak knew the factual contentions set forth in her letter were false, such evidence is not necessary. *See Dey*, 28 F.3d at 1459-60 (It is sufficient if the non-decisonmaker's discriminatory animus "may have affected [her] unflattering assessment of [plaintiff's] job performance" although the inference is made even stronger if the "alleged performance deficiencies were fabricated.").

*Inc.*, 968 F. Supp. 1251, 1256 (N.D. Ill. 1997) (citing cases); *Denisi*, 99 F.3d at 864 (age). A *prima facie* case creates a rebuttable presumption of discrimination and shifts the burden of production to the defendant to articulate lawful reasons for the plaintiff's discharge. Once the defendant articulates a nondiscriminatory, legitimate reason for its actions, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are pretextual. *Denisi*, 99 F.3d at 864. The plaintiff can establish pretext by showing either that a discriminatory reason more likely than not motivated the employer or that the employer's proffered explanation is incredible. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Defendants argue that plaintiff has failed to make out a *prima facie* case since there is no evidence that plaintiff was meeting Woolrich's legitimate expectations.[7] Defendants submit that plaintiff managed the store's staff in an abusive manner, citing evidence that Bittner and Oliver were advised that Waldack and Baer had quit, they had been provided with harsh memoranda written by plaintiff and were told that other employees were threatening to quit -- problems which would have left the store unable to function properly during the critical holiday season. Defendants also contend that as the store's acting manager, plaintiff had the responsibility to maintain a working environment free from all forms of sexual harassment and intimidation. Because he failed to do so and, in fact, sexually harassed Baer and disregarded his roommate's harassment of Baer, given that he was Baer's supervisor, they assert Woolrich had grounds to hold him responsible for his failure to take steps to prevent Baer from being harassed and intimated by his roommate.

---

[7]Defendants also argue that plaintiff cannot make out a *prima facie* case because he cannot show that others similarly situated were treated differently. However, as set forth herein, the forth prong can be met by showing plaintiff was replaced by a female (for gender discrimination) or a substantially younger person (age discrimination), and there is no contention that Baer, who replaced Kelman, was not a woman or not substantially younger than Kelman.

Even if the court does not consider plaintiff's prior positive performance evaluations since they dealt with his performance as an assistant manager,[8] plaintiff has still raised an issue of fact as to whether he was meeting Woolrich's legitimate expectations. Plaintiff states that after management received the notes forwarded by Waldack, the only problem expressed to him with regard to his management style was a preference for verbal communication over written notes and that he complied. Further, he points out that Waldack was his subordinate and plaintiff's opinion was that the problems were with Waldack's work habits, and not plaintiff's management style.[9] *See Weihaupt* v. *Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989) (For purposes of a *prima facie* case, a determination that an individual is meeting his employer's expectations may be based solely on the employee's testimony of his performance.). Plaintiff has also raised an issue as to whether he was taking steps to keep the store free from sexual harassment. The primary evidence cited by defendants in this respect are the allegations made by Baer,[10] but plaintiff has denied her charges. Thus, if he is to be believed, which at this stage he is, there was no sexual harassment which he was required to prevent with respect to her.

Defendants next contend that plaintiff has not provided evidence of pretext. They argue that Oliver and Bittner terminated plaintiff because of serious charges of wrongdoing and poor morale at the store, particularly that Woolrich needed its trained and experienced keyholders, Waldack and

---

[8] *See Cengr* v. *Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 (7th Cir. 1998) (What plaintiff did in the past does not mean he is qualified at a later time, and the court must focus on plaintiff's performance at the time of his termination.).

[9] In other words, the fact that turmoil was taking place during the critical holiday season, which can "make or break" a store, does not *per se* mean that it was Kelman who was not meeting Woolrich's legitimate expectations (unless Woolrich's expectation was that its managers were to run the store completely free from complaints from subordinate employees, which Woolrich has not claimed).

[10] Notably, the Schultz incident occurred while Kelman was assistant manager, not acting manager.

Baer, in order to operate the store during the critical holiday season and neither was willing to work for plaintiff. They assert that there is no evidence that Oliver and Bittner did not believe these reasons. Defendants also argue that the court must apply the "common actor" presumption that when an employee is hired and fired by the same decisionmaker in a relatively short time span the it is highly doubtful that the termination is the result of a sudden aversion to older or male employees. *See Roberts* v. *Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999).

While it is true that Oliver approved of plaintiff taking over as acting manager in September 1998 and three months later decided along with Bittner to terminate him, the "common actor" presumption is rebuttable, *id.*, and not only has the court already found under the direct method of proof that plaintiff has raised a genuine issue of fact as to whether a discriminatory intent more likely than not motivated the decision (which is also sufficient to meet this pretext prong), but he has presented evidence that defendants' proffered reasons were not credible. With respect to the "serious charges of wrongdoing" reason, plaintiff does not dispute that Baer *accused* him of sexual harassment, but asserts that pretext can be inferred because defendants jettisoned Woolrich's sexual harassment policy which required an investigation, he was not afforded progressive discipline (written warning, final warning, suspension, etc.) in accordance with Woolrich's disciplinary policy, and even if the statements allegedly made by plaintiff were true, defendants could not reasonably have believed they amounted to sexual harassment. Defendants argue that they confirmed Baer's claims by interviewing her and that the disciplinary policy does not require progressive discipline (and that, in any event, plaintiff had been warned by Pasternak regarding sexual harassment with respect to his remarks to Schultz). (*See* Defs.' Reply to Pl.'s Addl. Facts, ¶ 81.)

18

Woolrich's sexual harassment policy requires an investigation of sexual harassment charges. (*See supra*, note 4.) Woolrich's disciplinary policy (two different copies have been provided by plaintiff) sets out four steps or guidelines to be followed by Woolrich if an employee's work performance does not meet expected standards: oral reminder, written reminder, final written reminder and suspension (subject to possible discharge). (*See* Pl.'s Exs. 3, 4.) The language of the policy suggests its purpose is to give the employee an opportunity to change his behavior. (*Id.*) However, if the offense is of such a serious magnitude that it cannot be tolerated, an employee may be terminated without any prior warning. (*Id.*)

While the court recognizes that it does not sit as a super-personnel department to second-guess the investigative process, *Ghosh* v. *Indiana Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir. 1999), and an employer can choose to believe one employee over another and even choose to ignore contrary evidence, *see Logan* v. *Caterpillar, Inc.*, 246 F.3d 912, 920 (7th Cir. 2001), plaintiff's evidence raises the inference that the investigation was more than just incomplete or ill-informed but was, in fact, tainted by a discriminatory animus in that Oliver told him that what he said did not matter because Baer was a woman and plaintiff was a man. With respect to the Schultz charge for which plaintiff was warned, Pasternak's letter does not even say that Schultz made a complaint about sexual harassment and, further, merely recites that a comment allegedly made by plaintiff to Schultz – "What do you think of her [customer] for me, Maybe if she was a few years older" – *could* be considered sexual harassment. (*See* Defs.' 56.1 Statement, Bittner Aff., Ex. B.) A jury could infer that firing someone based on an ambiguous report of sexual harassment in a letter by a supervisor several months after the incident (notably defendants do not contend that Pasternak notified Human Resources about the Schultz' incident at or around the time of the incident) would not by itself have

warranted defendants in skipping over the various steps in their disciplinary policy to fire plaintiff and, thus, combined with a tainted investigation into Baer's claims, that defendants' proffered reason for firing plaintiff was pretextual.[11] *Logan*, 246 F.3d at 920 (Proof of pretext can include a showing that the reason given was insufficient to warrant the adverse job action.).

There is also evidence from which a jury could infer that Oliver and Bittner did not honestly believe the "poor morale" reason. There is at least a question as to whether defendants honestly believed Waldack was "unwilling" to work with plaintiff, where there is no evidence that they spoke with him after hearing he had quit but prior to terminating plaintiff and plaintiff's evidence is that Waldack had already agreed to come back to work prior to December 17, 1998. Moreover, the evidence that others might quit is lacking.[12] A jury could also infer defendants did not believe their contention that Waldack and Baer (as opposed to just plaintiff) were needed to run the store because they were experienced and trained keyholders, since Baer had only been a part-time keyholder for less than four months and was put into plaintiff's position, in part, upon the recommendation of Pasternak, whom as this court has noted may have been influenced by a discriminatory animus.

Because plaintiff has submitted evidence under both the direct and indirect methods of proof to survive summary judgment, the court denies defendants' motion for summary judgment as to his sex and age discrimination claims.

---

[11] Even in *Logan*, relied upon by defendants, "much of the information that [the employer] relied on in making its determination was provided by [plaintiff] himself." 246 F.3d at 921.

[12] The evidence for this belief appears to be that Waldack told McCarter "the whole staff wanted to quit." (Defs.' 56.1 Statement, ¶ 28 (citing Bittner Aff., ¶ 9; Oliver Aff., ¶ 5; Pltf.'s Dep. 6/7/00 at 125-27, 132)). However, the only mention of others quitting is in the form of double hearsay from plaintiff's own testimony, *see* Kelman Dep. at 127 ("Q. You said that Waldack had written or said to corporate that you lost it, . . . you couldn't handle the stress? A. Yes. He said the whole staff wanted to quit. . . . "), and is not mentioned in either Bittner's or Oliver's affidavits, undermining the inference that McCarter told Oliver and Bittner that others might quit.

## II.    Count III – Tortious Interference with Prospective Economic Advantage

In addition to his sex and age discrimination claims against Woolrich, plaintiff asserts claims

for tortious interference with employment relationship against individual defendants Baer, Pasternak

and Oliver. A cause of action for tortious interference with prospective economic advantage in an

employment relationship requires proof that (1) plaintiff had a reasonable expectation of continued

employment, (2) defendant knew of that expectancy, (3) defendant interfered for the purpose of

defeating plaintiff's expectancy, and (4) plaintiff incurred damages as a result of such interference.

*E.g., Fellhauer* v. *City of Geneva*, 142 Ill. 2d 495, 568 N.E.2d 870, 878 (Ill. 1991); *Vickers* v. *Abbott

Labs.*, 308 Ill. App. 3d 393, 719 N.E.2d 1101, 1116 (1st Dist. 1999). Normally such a claim "lies

only against a third party who causes the employer/employee relationship to end" and not corporate

officers, supervisors or co-workers, who are generally shielded from personal liability by the

"corporate officer" privilege in taking action on behalf of the corporation. *Naeemullah* v. *Citicorp

Servs., Inc.*, 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999). A claim against a co-worker will not be

defeated, however, if plaintiff can show, with respect to the third prong, that the defendant acted

maliciously – that is, "with personal animosity against him and that he acted for his own personal

interests – contrary to those of the corporation." *Id.*

Defendants argue that plaintiff has failed to put forward evidence that they acted maliciously

or for their own interests. The court concludes that plaintiff has put forward sufficient evidence with

respect to Baer and Pasternak, but not Oliver. A jury could infer that Baer's conduct was malicious

if it finds that she brought false allegations of sexual harassment against plaintiff and told Oliver to

fire him or she would sue Woolrich.[13] Likewise, although Baer quit, which might indicate she did

not have a personal interest in the job, the evidence read in the light most favorable to plaintiff shows

that after she notified Pasternak of her resignation, Oliver and Baer had a conversation with Baer in

which Baer told Oliver to fire plaintiff or she would sue, and immediately after Oliver fired plaintiff,

he "re-hired" Baer as plaintiff's replacement. Moreover, after Pasternak returned from maternity

leave and resigned, Baer became manager. This all occurred within a relatively short period of time

(Baer was hired a part-time keyholder in September 1998 and was manager of the store by March

1999) and thus, it can be inferred that Baer was, as claimed by plaintiff, pursuing her own personal

interests.

There is also sufficient evidence that Pasternak interfered with plaintiff's employment for

her own interests. Plaintiff contends that it was Pasternak's stated interest to make sure that a

woman not a man took over the store when she left. The court already concluded that a jury could

infer that Pasternak was motivated by a discriminatory animus and could also infer she was carrying

out her stated interest by showing Baer "the ropes" of management instead of either plaintiff or

Waldack (the two male supervisors), even though both had been with the store longer than had Baer,

and by recommending to Woolrich that Baer take over plaintiff's job. Moreover, a woman – Baer

– became manager of the store when Pasternak resigned shortly after her return from maternity leave.

---

[13]Defendants argue that plaintiff's contention that Baer made false accusations against him is based on mere speculation. For example, they point out that plaintiff did not present the affidavit of his roommate to contradict Baer's charges and argue that plaintiff's own testimony is contradictory as to his knowledge of the calls allegedly made by his roommate. While certainly additional affidavits to back up plaintiff's claim would bolster his case, neither have defendants put forward affidavits (other than Baer's) to back up Baer's complaints, when clearly some of the alleged comments were not made directly to Baer, which means at this stage, the court has only plaintiff's word against Baer's. On summary judgment, the court must read the facts in the light most favorable to the non-movant – in this case, plaintiff. Moreover, the evidence that plaintiff's testimony is contradictory is slim, at best, since the Cook County Commission on Human Rights complaint he filed appears to admit only that he was told at his termination what the calls were allegedly about. (*See* Defs.' 56.1 Reply to Pl.'s Addl. Facts, Ex. C.)

Finally, plaintiff asserts Oliver fired him knowing the allegations of sexual harassment were false and did not make a proper investigation. While the evidence of Oliver's knowledge of "falsity" of the charges is slim (since defendants do not assert plaintiff made the calls), there is evidence that he didn't care whether they were true or false if plaintiff proves Oliver made the stereotypical comments attributed to him by plaintiff. However, the court agrees that there is no evidence that Oliver acted to further his own interests as opposed to those of the corporation. Thus, the court denies summary judgment on Count III with respect to Baer and Pasternak but grants it with respect to Oliver.

## CONCLUSION

For the reasons stated above, the court denies defendants' motion for summary judgment as to Counts I and II and denies the motion as to Count III with respect Baer and Pasternak but grants it as to defendant Oliver [#19]. A status hearing is set for March 18, 2002.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 4, 2002